## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| IN RE HECLA MINING COMPANY DERIVATIVE SHAREHOLDER LITIGATION | Case No.: 2:12-CV-00097-REB |
| | Consolidated with Case Nos: 2:12-cv-00098-CWD 2:12-cv-000119-MHW |
| This Document Relates To:<br><br>ALL ACTIONS | **MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION TO DISMISS**<br><br>**(Docket No. 40)** |

Currently pending before the Court is Defendants' Motion to Dismiss (Docket No. 40). Having carefully reviewed the record, participated in oral argument, and otherwise being fully advised, the undersigned enters the following Memorandum Decision and Order:

## I.  RELEVANT BACKGROUND[1]

### A.    The Parties

1.      Plaintiffs Glenda Hesley, Gerald Moss, and Jeffrey Adams ("Plaintiffs") were stockholders of Nominal Defendant Hecla Mining Company ("Hecla") at all times relevant to this action.  *See* Compl., ¶¶ 20-22 (Docket No. 33); *but see supra*.

2.      Hecla is a Delaware corporation, headquartered in Coeur d'Alene, Idaho.  *See id.* at ¶¶ 23 & 25 (Docket No. 33).  Hecla engages in the discovery, acquisition, development, production, and sale of various precious and base metals, including silver, gold, lead, and zinc.

---

[1]  For the purposes of Defendants' Motion to Dismiss only, this section is drawn upon the allegations contained within Plaintiffs' Consolidated Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment ("Complaint") (Docket No. 33).  *See infra*.

**MEMORANDUM DECISION AND ORDER - 1**

The focal point of its production and the source of the vast majority of its revenues and profits is its silver production.  *See id*. at ¶¶ 2, 23, 62, & 63.  Hecla owns and operates two mines: (1) the Greens Creek mine near Juneau, Alaska, and (2) the Lucky Friday mine in Mullan, Idaho.  *See id*. at ¶¶ 2, 24 & 64.  Hecla's flagship mine is the Lucky Friday mine.  *See id*. at ¶¶ 3 & 68.

       3.     Plaintiffs bring this suit derivatively against all seven members of Hecla's board of directors and certain Hecla officers, alleging "breaches of fiduciary duties and other violations of law relating to a failure to ensure compliance with safety regulations."  *Id*. at ¶¶ 1, 28, 34, 40, 44, 47, 51, 55, & 59.  Specifically, the Individual Defendants include:

- <u>Phillips S. Baker, Jr.</u>: Hecla's CEO since May 2003; Hecla's President since November 2001; a Hecla director since November 2001; Hecla's CFO from May 2001 to June 2003; Hecla's COO from November 2001 to May 2003; and a Hecla Vice President from May 2001 to November 2001.  *See id*. at ¶ 27.

- <u>James A. Sabala</u>: Hecla's Senior Vice President since March 2008; and Hecla's CFO since May 2008.  *See id*. at ¶ 33.

- <u>John H. Bowles</u>: A Hecla director since 2006; Chairman of Hecla's Audit Committee since May 2006; a member of Hecla's Health, Safety, Environmental & Technical Committee ("Safety Committee") since August 2010 (and also on the predecessor of the Safety Committee since March 2007); serves or has previously served as a director on other companies' board of directors involved with mining or mineral exploration, including Mercator Minerals Ltd., Boss Power Corp., and HudBay Mineral Inc.; held an officer position with the Mining Suppliers Association of British Columbia; and was appointed a Fellow of the Canadian Institute of Mining and Petroleum.  *See id*. at ¶¶ 38 & 39.

- <u>Terry V. Rogers</u>: A Hecla director since 2007; Chairman of Hecla's Safety Committee since February 2012; a member of Hecla's Audit Committee since February 2008; had been a member of Hecla's Safety Committee since August 2010 (and also on the predecessor of the Safety Committee since February 2008); serves or has previously served as a member on other mining companies' boards of directors, including Kumtor Operating Company and Centerra Gold Inc.; and has held executive positions at other

**MEMORANDUM DECISION AND ORDER - 2**

mining companies during his 30 years of employment in the mining industry. *See id*. at ¶¶ 42 & 43.

- Charles B. Stanley: A Hecla director since 2007; a member of Hecla's Audit Committee since February 2008; and a member of Hecla's Safety Committee since August 2010 (and also on the predecessor of the Safety Committee since February 2008).  *See id*. at ¶ 46.

- Anthony P. Taylor: A Hecla director since 2002; a member of Hecla's Safety Committee since August 2010; was the inaugural Chairman of Hecla's Safety Committee until March 2011 (and also served on the predecessor of the Safety Committee since 2006); and served as a director and executive officer at several mineral exploration companies, including Crown Gold Corporation, SELEX Resources Ltd., Gold Summit Corporation, Millennium Mining Corporation, and Greencastle Resources Limited.  *See id*. at ¶¶ 49 & 50.

- Ted Crumley: A Hecla director since 1995, and Chairman of Hecla's board of Directors ("Board") since May 2006.  *See id*. at ¶ 54.

- George R. Nethercutt, Jr.: A Hecla director since 2005; served on Hecla's Audit Committee in 2006; a former U.S. Congressman, with mining legislation a focus of his political career; and served as a private consultant and represented clients with mining issues.  *See id*. at ¶¶ 57 & 58.

**B.    Mining Incidents at the Lucky Friday Mine**

4.    Between 2007 and 2011, a series of "rock burst", "ground fall", and "tunnel collapse" incidents occurred at the Lucky Friday mine.  *See id*. at ¶¶ 100-116, 120-121, & 125-131.  According to Plaintiffs, these events (and any related investigations) "put the Director Defendants[2] on notice of the persistent dangerous conditions at Lucky Friday mine."  *See* Pls.' Opp. to Mot. to Dismiss, p. 5 (Docket No. 43) (citing Compl., ¶¶ 104, 110, 113, 116, & 122 (Docket No. 33) ("Consistent with the Individual Defendants' fiduciary duties and obligations,

---

[2]  Plaintiffs refer to Individual Defendants Baker, Bowles, Rogers, Stanley, Taylor, Crumley, and Nethercutt collectively as "Director Defendants."  *See* Pls.' Opp. to Mot. to Dismiss, p. 1, n.1 (Docket No. 43).

**MEMORANDUM DECISION AND ORDER - 3**

defendants were required to be informed and upon information and belief, were informed of

these kinds of safety incidents.")).

     5.     In 2011, Hecla experienced three "tragic and catastrophic" accidents at the Lucky

Friday mine.  *See* Compl., ¶ 132 (Docket No. 33).

- April 15, 2011: A miner is killed when a rock fall strikes him while watering down a muck pile in a stope.  *See id.* at ¶¶ 133-134.  Hecla informs its investors of the accident on April 19, 2011.  *See id.* at ¶ 136.  The Mine Safety and Health Administration ("MSHA") investigates the accident and, on November 17, 2011, issues a report citing Hecla for various safety violations.  *See id.* at ¶¶ 137-139; *see also* Ex. B to Defs.' Mot. to Dismiss (Docket No. 40, Att. 3).[3]

- November 17, 2011: A contract miner is injured while trying to free plugged material in a bin excavation.  *See* Compl., ¶ 147 (Docket No. 33).  The miner and co-worker entered the bin from the top to remove blockage below them.  *See id.*  Material gave way, engulfing them; the miner was freed from the material and hospitalized, but died two days later from his injuries.  *See id.*  Hecla informs its investors of the accident on November 18, 2011.  *See id.* at ¶ 149.  MSHA investigates the accident and, on June 19, 2012, issues a report  citing the independent contractor and Hecla for various safety violations.  *See id.* at ¶¶ 148 & 150; *see also* Ex. C to Defs.' Mot. to Dismiss (Docket No. 40, Att. 4).

- December 14, 2011: Seven employees are injured by a rock burst while working below the surface.  *See* Compl., ¶ 151 (Docket No. 33).  MSHA investigates the accident, conducts a "special impact investigation," and orders Hecla to shut down the Lucky Friday mine until work conditions are safe.  *See id.* at ¶¶ 156 & 165.  According to Plaintiffs, "[t]hese inspections resulted in a multitude of citations and orders issued to [Hecla]."  *See id.* at ¶ 157; *see also id.* at ¶¶ 158-164 & 190 ("In all, MSHA issued 59 citations to Hecla for 27 different safety violations as a result of the special impact investigation – of those 27 distinct types of violations, 18 of them represented repeat violations for which the Lucky Friday mine had received a combined 87 total citations over the previous decade.").

---

    [3] MSHA's enforcement orders and citations were terminated based on Hecla's corrective actions.  *See* Ex. B to Defs.' Mot. to Dismiss, pp. 7-9 (Docket No. 40, Att. 3).

**MEMORANDUM DECISION AND ORDER - 4**

**C.   Lucky Friday Mine Closes Indefinitely**

6.     During the inspection following the December 14, 2011 incident, MSHA issued a citation to Hecla regarding a build-up of sand and concrete material on the walls and beams of the primary access to the Lucky Friday mine, known as the "Silver Shaft."  *See id*. at ¶ 158.[4]

7.     On January 5, 2012, MSHA issued a closure order for the Lucky Friday mine, citing built-up material in the Silver Shaft.  *See id*. at ¶ 167.

8.     Because federal law requires mines to have two points of exit, on January 11, 2012, Hecla announced that the Lucky Friday mine would be closed until early 2013 to remove the build-up in the Silver Shaft.  *See id*. at ¶¶ 168 & 169.

9.     Owing to the Lucky Friday mine's closure, Hecla lowered its estimated silver production for 2012 from 9.5 million ounces to 7 million ounces – an approximate loss in production, based on market value, of at least $70.7 million.  *See id*. at ¶¶ 191 & 270.  Moreover, on February 21, 2012, Hecla reported that an additional $62 million in costs would be necessary to bring the Lucky Friday mine into compliance with MSHA safety regulations.  *See id*. at ¶¶ 192 & 270.

**D.   Procedural Backdrop**

10.    On February 29, 2012, Plaintiff Hesley brought a shareholder derivative action on Hecla's behalf (Case No. 2:12-cv-00097-REB).  On February 29, 2012, Plaintiff Moss brought a shareholder derivative action on Hecla's behalf (Case No. 2:12-cv-00098-CWD).  On March 9,

---

[4] Although Plaintiffs' Complaint contains allegations of several other MSHA violations and/or citations, there are no allegations about any previous MSHA citations for built-up material in the Silver Shaft.  Additionally, Plaintiffs do not allege that any injury resulted from the build-up, and they do not allege that MSHA claimed any connection between the build-up in the Silver Shaft and any of the above-cited incidents.

**MEMORANDUM DECISION AND ORDER - 5**

2012, Plaintiff Adams brought a shareholder derivative action on Hecla's behalf (Case No. 2:12-cv-00119-MHW).  On May 17, 2012, the undersigned consolidated these three actions into one case (Case No. 2:12-cv-0097-REB).  *See* 5/17/12 Order (Docket No. 14).

      11.     On June 20, 2012, the parties to this action stipulated to its temporary stay, pending either (1) the resolution of a motion to dismiss in a related securities fraud lawsuit then-situated in this Court before U.S. District Judge B. Lynn Winmill, or (2) any party's unilateral decision to lift the stay with 10 days notice.  *See* Stip. to Temporarily Stay Action (Docket No. 21).  On June 28, 2012, the undersigned adopted the parties' stipulation and temporarily stayed this action.  *See* 6/28/12 Order (Docket No. 22).

      12.     On July 10, 2012, the parties consented to the undersigned's jurisdiction.  *See* 7/10/12 Notice (Docket No. 23).

      13.     On November 8, 2012, Defendants notified Plaintiffs that they intended to lift the temporary stay and, on November 9, 2012, filed a formal Notice of Lifting the Stay of Proceedings, explaining that, on September 25, 2012, the Delaware Court of Chancery "issued a decision dismissing a shareholder derivative lawsuit against the same defendants with virtually identical allegations" and that "[t]his decision demonstrates conclusively how Delaware law would treat the plaintiffs' allegations here."  *See* Notice (Docket No. 28); *see also* Defs.' Status Report (Docket No. 30).  The referenced decision is *South v. Baker*, 62 A.3d 1 (Del. Ch. 2012).

      14.     On January 7, 2013, Plaintiffs filed their Complaint.  *See* Compl. (Docket No. 33).  Therein, Plaintiffs generally allege that the Defendants' "wrongful conduct . . . ultimately resulted in the closure of the Lucky Friday mine, causing severe injury to Hecla's financial position and prospects, as well as causing substantial damages to Hecla's reputation, goodwill,

**MEMORANDUM DECISION AND ORDER - 6**

and standing in the business community." *See id*. at ¶ 1.  Further, Plaintiffs assert claims on

behalf of Hecla against Hecla's board of directors (and its CEO and CFO) for breach of fiduciary

duties and unjust enrichment.  *See id*. at ¶¶ 315-330.

> 15.     On February 8, 2013, Defendants filed the at-issue Motion to Dismiss, primarily

arguing that, because Plaintiffs made no demand upon Hecla's present board of directors, they

were required, but failed, to adequately plead that such demand would be futile.  *See* Defs.'

Mem. in Supp. of Mot. to Dismiss, pp. 9-26 (Docket No. 40, Att. 1).  Defendants additionally

submit that Plaintiffs failed to plead with particularity that they purchased shares of Hecla before

the date of the first alleged wrongdoing as alleged in their Complaint.  *See id*. at pp. 8-9.

> 16.     On June 11, 2013, Gerald Moss was dismissed/withdrawn as a named Plaintiff.

*See* Not. of Voluntary Dismissal (Docket No. 53); 6/11/13 DEO (Docket No. 54).

> 17.     On July 16, 2013, the undersigned heard oral argument on Defendants' Motion to

Dismiss.  *See* 7/16/13 Minute Entry (Docket No. 56).

## II.  DISCUSSION

### A.     Legal Standard

Typically, FRCP 8(a)(2) requires only "a short and plain statement of the claim showing

that the pleader is entitled to relief," to "give the defendant fair notice of what the . . . claim is

and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

While a complaint attacked by an FRCP 12(b)(6) motion to dismiss "does not need detailed

factual allegations," it must set forth "more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  *Id*. at 555.  To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for

**MEMORANDUM DECISION AND ORDER - 7**

relief that is plausible on its face." *Id*. at 570.  A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged.  *Id*. at 556.  The plausibility standard is not akin to a

"probability requirement," but it asks for more than a sheer possibility that a defendant has acted

unlawfully.  *Id*.  Where a complaint pleads facts that are "merely consistent with" a defendant's

liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id*. at 557.

The Supreme Court identified two "working principles" that underlie *Twombly* in

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  First, the court need not accept as true, legal

conclusions that are couched as factual allegations.  *See id*.  FRCP 8 does not "unlock the doors

of discovery for a plaintiff armed with nothing more than conclusions."  *Id*. at 678-79.  Second,

to survive a motion to dismiss, a complaint must state a plausible claim for relief.  *See id*. at 679.

"Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense." *Id*.

Providing too much in the complaint may also be fatal to a plaintiff.  Dismissal may be

appropriate when a plaintiff has included sufficient allegations disclosing some absolute defense

or bar to recovery.  *See Weisbuch v. County of L.A.*, 119 F.3d 778, 783, n.1 (9th Cir. 1997)

(stating that "[i]f the pleadings establish facts compelling a decision one way, that is as good as

if depositions and other expensively obtained evidence on summary judgment establish the

identical facts").

Generally, a dismissal without leave to amend is improper unless it is beyond doubt that

the complaint "could not be saved by any amendment."  *Harris v. Amgen, Inc.*, 573 F.3d 728,

**MEMORANDUM DECISION AND ORDER - 8**

737 (9ᵗʰ Cir. 2009) (issued two months after *Iqbal*).[5]  The Ninth Circuit has held that "in

dismissals for failure to state a claim, a district court should grant leave to amend even if no

request to amend the pleading was made, unless it determines that the pleading could not

possibly be cured by the allegation of other facts."  *Cook, Perkiss and Liehe, Inc. v. Northern

California Collection Serv., Inc.*, 911 F.2d 242, 247 (9ᵗʰ Cir. 1990).  The issue is not whether a

plaintiff will prevail but whether he "is entitled to offer evidence to support the claims."  *Diaz v.

Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9ᵗʰ Cir. 2008) (citations

omitted).

     However, FRCP 23.1 contains pleading requirements specific to shareholder derivative

suits.  For example, "[a] shareholder seeking to vindicate the interests of a corporation through a

derivative suit must first demand action from the corporation's directors or plead with

particularity the reasons why such demand would have been futile."  *In re Silicon Graphics Inc.

Securities Litig.*, 183 F.3d 970, 989 (9ᵗʰ Cir. 1999) (citing Fed. R. Civ. P. 23.1(b)(3)(A) & (B)

("The complaint must be verified and must . . . state with particularity . . . any effort by the

plaintiff to obtain the desired action from the directors . . .; and . . . the reasons for not obtaining

the action or not making the effort.")); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90,

101 (1991) (demand requirement premised on "the basic principle of corporate governance that

---

     [5] There is some question as to the continued vitality of the liberal amendment policy expressed in *Harris*, based as it is on language in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), suggesting, in part, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim . . . ." Given *Twombly* and, more recently, *Iqbal's* rejection of the liberal pleading standards adopted by *Conley*, a question arises as to whether the liberal amendment policy of *Harris* still exists. Nevertheless, the Ninth Circuit has continued to apply the liberal amendment policy even after dismissing claims for violating *Iqbal* and *Twombly*.  *See, e.g.*, *Market Trading, Inc. v. AT & T Mobility, LLC*, 388 Fed. Appx. 707 (9ᵗʰ Cir. 2010) (unpublished).

**MEMORANDUM DECISION AND ORDER - 9**

the decisions of a corporation – including the decision to initiate litigation – should be made by the board of directors," not individual shareholders).  Additionally relevant here, a shareholder suing derivatively must allege that he or she owned stock "at the time of the transaction complained of."  Fed. R. Civ. P. 23.1(b)(1).  A plaintiff who fails to satisfy the contemporaneous ownership requirement lacks standing to bring a shareholder derivative suit.  *See In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1202 (N.D. Cal. 2007) ("A derivative plaintiff has no standing to challenge option transactions that occurred prior to the time that plaintiff owned company stock.").

In these respects, then, FRCP 23.1 raises the "pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under FRCP 12(b)(6)."  *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010); *see also McPadden v. Sidhu*, 964 A.2d 1262, 1269 (Del. Ch. 2008) (noting that this burden "is more onerous than that demanded by FRCP 12(b)(6).").

## B.   Plaintiffs Have Not Adequately Pled Demand Futility

Plaintiffs acknowledge that they made no demand upon any of the Hecla board prior to filing the present lawsuit.  *See Compl.*, ¶¶ 275-314 (Docket No. 33) ("Making a demand on the Board would have been futile.").  Hence, their Complaint must plead particularized factual allegations establishing demand excusal.  *See supra.*  FRCP 23.1 does not set forth the circumstances under which a demand would be futile; instead, for these standards, courts turn to the law of the state of incorporation – here, Delaware.  *See In re Silicon Graphics*, 183 F.3d at 990.

**MEMORANDUM DECISION AND ORDER - 10**

Under Delaware law, when a decision of the board of directors is challenged in a derivative suit, two tests are available to determine whether demand is futile.  *See Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

The first test – the "*Aronson*" test – "applies to claims involving a contested transaction *i.e.*, where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties."  *Id*. (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984)).  Under the *Aronson* test, a plaintiff must plead sufficient facts to raise a reasonable doubt that: "(1) the directors are disinterested and independent [or that] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  *Aronson*, 473 A.2d at 814.

The second test – the "*Rales*" test – "applies where the subject of a derivative suit is not a business decision of the [b]oard but rather a violation of the [b]oard's oversight duties."  *Wood*, 953 A.2d at 140 (citing *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).  In such cases, demand may be excused as futile if a plaintiff "can create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  *Ryan v. Gifford*, 918 A.2d 341, 353 (Del. Ch. 2007) (citing *Rales*, 634 A.2d 933-34).  Under the *Rales* test, "[i]ndependence is a fact-specific determination made in the context of a particular case."  *Beam ex. rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049-50 (Del. 2004).  A key inquiry "is whether the plaintiffs have pled facts that show that [the] directors face a sufficiently substantial threat of personal liability" to render them "interested" for purposes of considering the demand. *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003); *see also Desimone v. Barrows*, 924 A.2d 908, 928 (Del. Ch. 2007) (where derivative plaintiff does not challenge a specific transaction

**MEMORANDUM DECISION AND ORDER - 11**

approved by board, plaintiff must adequately plead that majority of company's board of directors were incapable of objectively responding to demand because they either (1) "face a sufficiently substantial threat of personal liability" and are thus themselves interested, or (2) "are compromised in their ability to act independently of interested directors").

Here, Defendants seek the dismissal of Plaintiffs' claims against the backdrop of the *Rales* test, essentially arguing that Plaintiffs have not properly alleged that (1) Hecla's directors face a substantial likelihood of liability, or that (2) a majority of Hecla's directors lack independence. *See* Defs.' Mem. in Supp. of Mot. to Dismiss, pp. 10-26 (Docket No. 40, Att. 1). Plaintiffs disagree, seemingly favoring the *Aronson* test's application to excuse the absence of any pre-suit demand upon Hecla's board. *See* Pls.' Opp. to Mot. to Dismiss, pp. 14-22 (Docket No. 43).

      1.    <u>Plaintiffs' Complaint Does Not Clearly Implicate the Business Judgment Rule as Contemplated by the Aronson Test</u>

It is not immediately clear whether Plaintiffs are alleging claims based upon the Hecla board's (1) failure to monitor, or (2) conscious decision not to take action (or both). *Compare* Compl. ¶ 284 (Docket No. 33) ("All of the Director Defendants are explicitly responsible for the oversight of Hecla management and are ultimately responsible for the repeated and pervasive culture of non-compliance with safety violations."), *with id.* at ¶ 282 ("All of the Director Defendants, despite personal knowledge of widely reported red flags, consciously chose to take no meaningful actions to address the red flags and thus, breached their fiduciary duties to ensure compliance with safety regulations."). On the one hand, Plaintiffs' claims seem to be based simply on an alleged negligent dereliction of duty theory of recovery; on the other hand, they

**MEMORANDUM DECISION AND ORDER - 12**

could be interpreted as attacking the Hecla board's alleged affirmative and informed decision not to take necessary compliance actions and safety-related measures.

Delaware case law does not definitively answer the question of which test – *Rales* or *Aronson* – applies to such situations.  *Compare In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007) ("The Court cannot address the business judgment of an action not taken and, therefore, should concern itself with what is now known as the *Rales* test . . . ."), *with South*, 62 A.3d at *15 ("A board that fails to act in the face of such information makes a conscious decision, and the decision not to act is just as much of a decision as a decision to act.").  Regardless, to the extent Plaintiffs' claims allege the Hecla board's mismanagement of the company or violations of the board's oversight duties (and the undersigned concludes for these purposes that Plaintiffs do make such allegations), there is no dispute that the *Rales* test applies.  *See, e.g.*, Defs.' Reply in Supp. of Mot. to Dismiss, p. 10, n.4 (Docket No. 52) ("But the Delaware Supreme Court has held clearly that *Rales* 'applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties.'") (quoting *Wood*, 953 A.2d at 140).  Still, as a practical matter, even if this Court were to apply the *Aronson* test to the Complaint's allegations, the analysis relating to the Hecla directors' interestedness and independence (*see infra*) would control the conclusion of any business judgment rule analysis, for the reason that Plaintiffs' rationale for arguing that the business judgment rule does not apply is similar to the argument raised with respect to the alleged substantial threat of personal liability facing the Defendants.

Indeed, which exact test for analyzing demand futility might be used here – whether the *Aronson* test or the *Rales* test – appears inconsequential to Plaintiffs in their opposition to

**MEMORANDUM DECISION AND ORDER - 13**

Defendants' Motion to Dismiss.  *See* Pls.' Opp. to Mot. to Dismiss, p. 14 (Docket No. 43) ("In

any event, in this case, the label of which test to apply is immaterial.  Under either standard, the

facts alleged raise a reasonable doubt that the Director Defendants were capable of making an

impartial decision regarding this litigation.").  Given the inherent overlap between the two tests

(at least insofar as whether Hecla's directors were interested and/or independent),[6] this

Memorandum Decision and Order  will consider the parties' respective arguments vis à vis the

*Rales* test, regardless of whether such arguments are (or could be) otherwise encapsulated by

some other demand futility test.  Therefore, the Court will analyze whether, at the time the

Complaint was filed, Hecla's board could have exercised its "independent and disinterested

business judgment in responding to a demand."  *Rales*, 634 A.2d at 934.

> ### 2.   Plaintiffs Have Not Properly Alleged That Hecla's Directors/Officers Face a Substantial Likelihood of Liability

"To plead demand futility, a stockholder plaintiff must plead facts establishing a

sufficient connection between the corporate trauma and the board such that at least half of the

---

[6] "The *Aronson* and *Rales* [tests] have been described as complementary versions of the same inquiry."  *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, *16 (Del. Ch. 2013) (citing *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, *4 (Del. Ch. 2013) ("[T]he *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination.  It allows, in other words, a court to determine both whether a corporate board on which demand might be made is disinterested and independent, and whether a majority of directors face a substantial likelihood of personal liability, because doubt has been created as to whether their actions were products of a legitimate business judgment."); *Guttman*, 823 A.2d at 501 ("At first blush, the *Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry . . . .  Upon closer examination, however, that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*."); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.02[b][3][iii], at 9-97 (2011) ("[I]t is arguable that the current state of the law is conceptually inverted and that it would be both simpler and more direct to regard the original *Aronson* analysis as a subpart of the more generally applicable and flexible principle set forth in *Rales*.")).

**MEMORANDUM DECISION AND ORDER - 14**

directors face 'a substantial likelihood of personal liability.'" *South*, 62 A.3d at \*14 (quoting *Desimone*, 924 A.2d at 914). Simply "'describing the calamity and alleging that it occurred on the directors' watch'" is not enough. *South*, 62 A.3d at \*14 (quoting *La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 335-36 (Del. Ch. 2012)). Moreover, "the mere threat of personal liability . . . is insufficient to challenge either the independence or disinterestedness of directors." *Aronson*, 473 a.2d at 815. Instead, "demand will be excused based on a possibility of personal director liability only in the rare case when a plaintiff is able to show director conduct that is 'so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.'" *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) (citing *Aronson*, 473 A.2d at 815).

In their effort to meet this more rigorous standard (and, thereby, excuse the absence of any pre-suit demand), Plaintiffs contend that the majority of Hecla's board faces a substantial threat of liability because (1) the board members breached their fiduciary duties in consciously choosing to take no meaningful steps to oversee the Lucky Friday mine's compliance with MSHA safety regulations (*see* Pls.' Opp. to Mot. to Dismiss, pp. 14-19 (Docket No. 43) (citing Compl., ¶¶ 281-285 (Docket No. 33)); (2) the board members breached their fiduciary duties by allowing false and misleading statements to be disclosed to the public (*see* Compl., ¶¶ 224-258 & 289 (Docket No. 33); (3) the directors who sit on the Safety and Audit Committees face further risk of liability owing to their "heightened duties" (*see* Pls.' Opp. to Mot. to Dismiss, pp. 19-20 (Docket No. 43) (citing Compl., ¶¶ 211-217, 292-300 (Docket No. 33)); and (4) directors Baker and Taylor engaged in insider stock sales in violation of their duty of loyalty (*see* Pls.' Opp. to Mot. to Dismiss, pp. 20-22 (Docket No. 43) (citing Compl., ¶¶ 301-302 (Docket No.

**MEMORANDUM DECISION AND ORDER - 15**

33)).  According to Defendants, however, such claims are unsupported by the particularized

allegations required under Delaware law.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, pp. 11-

24 (Docket No. 40, Att.1); *see also* Defs.' Reply in Supp. of Mot. to Dismiss, pp. 5-15 (Docket

No. 52).

###### a.  The Alleged Breaches of Fiduciary Duties by Hecla Directors Regarding Oversight Responsibilities

Plaintiffs' allegations that Hecla's directors (1) "knowingly permitt[ed] [Hecla] to act

with complete disregard of necessary safety requirements," and (2) "fail[ed] to take actions

concerning the Lucky Friday mine after being put on notice of the need to correct safety issues"

(Compl., ¶¶ 289-290 (Docket No. 33)) essentially amount to a classic "*Caremark* claim."  *See*

*South*, 62 A.3d at *6 ("[D]irectors can be held liable under this [*Caremark* claim] theory for

knowingly causing or consciously permitting the corporation to violate positive law, or for

failing utterly to attempt to establish a reporting system or other oversight mechanism to monitor

the corporation's legal compliance.").[7]  Because such a claim "requires a plaintiff to show that

'the directors knew that they were not discharging their fiduciary obligations' – i.e., bad faith[8] –

---

[7]  *South* dealt with virtually identical allegations to this case in a parallel derivative suit brought against Hecla defendants in the Delaware Court of Chancery.  There, the court dismissed the plaintiffs' claims because the demand futility allegations did not contain sufficient particularity.  *See South* 62 A.3d at *19 ("Because the complaint lacks particularized facts supporting a reasonable inference that a majority of the Board faces a substantial risk of liability, the Souths have not pled demand futility and their lawsuit is subject to dismissal under Rule 23.1.").  Even so, the dismissal was specifically without prejudice to this Idaho derivative case.  *See id*. at *26 ("Consequently, the dismissal of the Souths' complaint should not have preclusive effect on the litigation of more diligent stockholders . . . .").  Defendants here, of course, rely heavily upon *South's* consideration of the same issues/arguments raised in their Motion to Dismiss; conversely, Plaintiffs attempt to distinguish their case from *South*, arguing that they represent the above-referenced "more diligent stockholders."

[8]  This is consistent with section 102(b)(7) of Delaware Corporation Law, allowing companies to limit the personal liability of a director to the corporation or its shareholders for

**MEMORANDUM DECISION AND ORDER - 16**

as a 'necessary condition[ ] predicate for director oversight liability,' it has been considered

'possibly the most difficult theory in corporation law.'" *In re China Auto. Sys. Inc. Deriv. Litig.*,

2013 WL 4672059, *7 (Del. Ch. 2013) (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006);

*In re Caremark Intern. Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)); *see also Beam*,

845 A.2d at 1048-49 ("[D]irectors are entitled to a presumption that they were faithful to their

fiduciary duties.  In the context of pre-suit demand, the burden is upon the plaintiff in a

derivative action to overcome that presumption.").

      Plaintiffs attempt to satisfy their burden of pleading particularity by contending that the

board (1) violated positive law, (2) ignored red flags concerning safety violations, and (3) failed

to ensure that a reasonable information and reporting system existed.  *See* Compl., ¶¶ 289-291

(Docket No. 33).  Defendants contend such arguments are an inadequate toward showing that the

Hecla Directors/Officers face a substantial likelihood of liability.  *See* Defs.' Mem. in Supp. of

---

monetary damages for breach of fiduciary duty so long as the director's actions are (1) not a
breach of their duty of loyalty, (2) not made in bad faith, and/or (3) do not involve intentional
misconduct or a knowing violation of law.  *See* 8 Del. C. § 102(b)(7); *see also* Defs.' Mem. in
Supp. of Mot. to Dismiss, p. 12, n.4 (Docket No. 40, Att. 1) (requesting that Court take judicial
notice of Hecla's certificate of incorporation and section 102(b)(7) provision therein).  Plaintiffs'
argument against section 102(b)(7)'s application at the motion to dismiss stage (*see* Pls.' Opp. to
Mot. to Dismiss, pp. 22-23 (Docket No. 43) is without merit.  *See, e.g.*, *Metropolitan Life Ins.
Co. v. Tremont Group Holdings, Inc.*, 2012 WL 6632681. *7 (Del. Ch. 2012) (addressing
whether exculpatory provision application is affirmative defense, holding that, "[n]evertheless,
the Court may grant a motion to dismiss a claim where the plaintiffs have not adequately pled
that the defendants' conduct constitutes a non-exculpated claim against a person subject to, for
example, a limited partnership agreement containing an exculpation clause.") (citing
*Brinckerhoff v. Enbridge Energy Co.*, 2012 WL 1931242, *2, n.11 (Del. Ch. 2012); *Wood*, 953
A.2d at 141; *Malpiede v. Townson*, 780 A.2d 1075, 1079 (Del. 2001)); *Official Comm. of
Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, 2004 WL 1949290, *9, n.38
(Del. Ch. 2004) ("A defense under [section] 102(b)(7) may be considered in the context of a
motion to dismiss."); *but see In re Tower Air, Inc.*, 416 F.3d 229, 242 (3rd Cir. 2005)
(recognizing in dictum that exculpation provision is affirmative defense).

**MEMORANDUM DECISION AND ORDER - 17**

Mot. to Dismiss, pp. 12-16 (Docket No. 40, Att. 1).  The undersigned agrees that Plaintiffs have

failed to adequately plead the particular details of their *Caremark* claim.

First, Plaintiffs repeatedly assert throughout their Complaint that Defendants actively

caused or permitted Hecla to violate mine safety law.  *See, e.g.*, Compl., p. 37 (Docket No. 33)

("**The Director Defendants Are Culpable for Their Failure to Ensure Compliance**")

(emphasis in original); *id* at ¶ 179 ("One of the **primary duties of the Director Defendants was**

**to ensure that the Company's operations are in compliance with all applicable laws,**

**including MSHA regulations**.") (emphasis in original); *id*. at ¶ 204(iv) ("The Director

Defendants were supposed to fulfill these functions through, among other things . . . . **reviewing**

**compliance with applicable laws and regulations and adopting policies of corporate**

**conduct to assure compliance with applicable laws and regulations** . . . ." (emphasis in

original) (internal quotations omitted); ¶ 289 ("Directors Bowles, Rogers, Stanley, Taylor,

Baker, Crumley, and Nethercutt face a substantial likelihood of liability for breach of fiduciary

duty for knowingly permitting the Company to act with complete disregard of necessary safety

requirements . . . ."); *see also* Pls.' Opp. to Mot. to Dismiss, p. 14 (Docket No. 43) ("Plaintiffs

allege that the Director Defendants knew their affirmative duty to ensure that the Lucky Friday

mine complied with MSHA safety regulations; they knew the Lucky Friday mine was not in

compliance, and chose to taken no meaningful steps to ensure compliance.") (citing Compl., *¶¶*

*281-285* (Docket No. 33)).  However, as Defendants point out, Plaintiffs provide no allegations

of fact beyond these conclusory assertions regarding either the information made available to the

board or what the board did in response to such information.  *See* Defs.' Mem. in Supp. of Mot.

**MEMORANDUM DECISION AND ORDER - 18**

to Dismiss, p. 13 (Docket No. 40, Att. 1).[9]  Simply put, more is needed.  *See South*, 62 A.3d at

*16 (dismissing plaintiffs' emphasis on MSHA's findings to support claim that board actively

violated positive law, holding "it is not reasonable to infer that the Board acted in bad faith based

on references to 'management,' particularly when the MSHA Report focuses on nuts-and-bolts

operational issues . . . .  Each of the illustrative violations references a day-to-day operational

issue in the Lucky Friday mine.  None suggests a Board-level decision.");[10] *see also Wood*, 953

A.2d at 142 ("[T]he Complaint alleges many violations of federal securities and tax laws but

does not plead with particularity the specific conduct in which each defendant "knowingly"

engaged, or that the defendants knew that such conduct was illegal.") (citing *Rattner v. Bidzos*,

2003 WL 22284323, *13 (Del. Ch. 2003) (holding that demand was not excused where

---

[9]  In other words, how is one to say that the Director Defendants were indeed informed of or were separately aware that the Lucky Friday mine was violating certain safety regulations and recommended a course of action that was ignored or improperly implemented by the appropriate personnel?  Plaintiffs' allegations are far too sparse upon such critical components of their claim and that, via their Motion to Dismiss, is Defendants' point.

[10]  The Court has carefully considered Plaintiffs' efforts to distinguish this case from *South* and it appears that more pre-filing investigative work may well have occurred here than in *South.  See* Pls.' Opp. to Mot. to Dismiss, pp. 7-12 (Docket No. 43).  However, even though Plaintiffs assert that their allegations "reveal a long history of dangerous conditions and repeated safety violations *consciously ignored by the culpable Defendants*" (*id*. at p. 8 (emphasis added)), the underpinnings for such a statement simply are inadequate.  None of the paragraphs cited by Plaintiffs supports their proposition (¶¶ 68-193 & 220-222 (*id*.)) or contains any factual allegations detailing with any particularity the Hecla directors' conscious disregard of their duties.  Instead, such paragraphs contain generalized background information and conclusory allegations that function only through implication, and strained implication at that.  Similarly, Plaintiffs' arguments in response to Defendants' Motion to Dismiss, like the referenced allegations in their Complaint, do not specifically speak to Defendants' knowledge, if any, or to any corresponding conduct in the face of that knowledge and, therefore, their responsive arguments also fall short of supporting the underlying claims against a motion to dismiss.  *See Wood*, 953 A.2d at 140 ("'[C]onclusory allegations are not considered as expressly pleaded facts or factual inferences.'") (quoting *Beam*, 845 A.2d at 1048 (Del. 2004)).  So, while this case and *South* have their differences, they remain alike in this important respect.

**MEMORANDUM DECISION AND ORDER - 19**

complaint "is quick to prattle off numerous alleged infractions of laws, rules, and principles [but never indicates] the accounting procedures employed by the company or the Board's involvement in [the company's] financial recording and reporting systems.")).

Second, Plaintiffs' allegations that the Director Defendants were aware of, yet ignored, "red flags" concerning safety violations (*see, e.g.*, Compl., ¶¶ 218-219, 221, 281, & 290 (Docket No. 33)) are similarly lacking.  The Complaint does detail at length various incidents comprising alleged "evidence of illegality – the proverbial 'red flag[s]'" (*South*, 62 A.3d at \*15),  but it fails to then connect the dots with particularized factual allegations that Hecla's board consciously failed to act after learning about them.  There are no particularized facts about the board's conduct generally in that regard, nor particularized facts speaking to whether the board was actually aware of the red flags, what the board was told about any red flags, or what was the board's response to those red flags.  *See id*. at \*17 ("Although the complaint asserts that the directors knew of and ignored the 2011 safety incidents, the complaint nowhere alleges anything that the directors were told about the incidents, what the Board's response was, or even that the incidents were connected in any way.");[11] *In re Verifone Holdings, Inc. S'holder Deriv. Litig.*,

_____

[11]   The sheer number of alleged "red flags" in this case unquestionably exceeds those considered in *South*.  However, it cannot be said that a large volume of such red flags is a substitute for Plaintiffs' obligation to plead with specificity the board's knowledge of, and response to, those red flags – particularly when no alleged red flags spoke to built-up material in the Silver Shaft.  Further, the board's knowledge cannot be inferred simply by virtue of the 2011 incidents (discussed *supra*).  *See Stone*, 911 A.2d at 373 ("With the benefit of hindsight, the plaintiffs' complaint seeks to equate a bad outcome with bad faith.  The lacuna in the plaintiffs' argument is a failure to recognize that the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both . . . .");  *see also South*, 62 A.3d at \*18 ("In a large corporation engaged in a dangerous business, three incidents could readily happen in a single year because of decisions made and actions taken sufficiently deep in the organization for the board not to have been involved.");  *In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 873, 880 (D. Md. 2005) ("Perhaps with the benefit of hindsight it may be said that

**MEMORANDUM DECISION AND ORDER - 20**

2009 WL 1458233, *11 (N.D. Cal. 2009) ("Again, the director defendants are not required to

possess detailed information about all aspects of the business, nor are they expected to monitor

or otherwise gauge all of the factors affecting inventory valuation [(an alleged red flag)].

Plaintiffs do not allege with particularity how, when, or which of the directors became aware of

the inventory valuations and how they failed to act upon this knowledge.").  As a result,

Plaintiffs' reliance upon such alleged red flags, without more, is not sufficient to support an

argument that Defendants face a substantial likelihood of liability.[12]

Third, Plaintiffs' contention that Hecla's board allowed Hecla "to operate without an

adequate system of internal controls" (Compl., ¶ 291 (Docket No. 33)) is also unsupported by

any particularized factual allegations in the Complaint.  *Cf. Caremark*, 698 A.2d at 971 (holding

---

the fund trustees were asleep at the switch and should have been more vigilant in detecting late
trading and market timing activities occurring within the Janus funds.  However, at most their
failure to do so constituted negligence, not the intentional conduct, recklessness, or, at the least,
gross negligence required to hold them liable for their inactions.") (internal Delaware citations
omitted).  Finally, any blanket argument that board members on Hecla's Safety Committee must
have known about, yet consciously ignored, the alleged problems at the Lucky Friday mine
because they were charged with overseeing mine safety is not persuasive (*see infra*).  *See South*,
62 A.3d at *17 ("As numerous Delaware decisions make clear, an allegation that the underlying
cause of a corporate trauma falls within the delegated authority of a board committee does not
support an inference that the directors on that committee knew of and consciously disregarded
the problem for purposes of Rule 23.1.") (citing *Wood*, 953 A.2d at 142; *In re Goldman Sachs
Grp., Inc. S'holder Litig.*, 2011 WL 4826104, *22-23 (Del. Ch. 2011); *Citigroup*, 964 A.2d at
126-28; *Rattner*, 2003 WL 22284323 at *12-13; *Desimone*, 924 A.2d at 938).

[12] Plaintiffs' reliance on *In re Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp.
2d 453 (S.D.N.Y. 2010), is overstated.  *See* Pls.' Opp. to Mot. to Dismiss, pp. 15-16 (Docket No.
43).  In addition to not being controlling upon this Court, in *Pfizer*, the complaint contained
*factually-specific* allegations concerning the board's knowledge of purported red flags.  *See
Pfizer*, 722 F. Supp. 2d at 460 ("[T]he Complaint details at great length a large number of reports
made to members of the board [relating to settlements, violation notices and warning letters,
kickbacks, and off-label marketing] from which it may reasonably be inferred that they all knew
of Pfizer's continued misconduct and chose to disregard it.").  In contrast, Plaintiffs' Complaint
here is not nearly as detailed, particularly as to the critical links to the board and the board's
knowledge.

**MEMORANDUM DECISION AND ORDER - 21**

that prerequisite showing of bad faith can be made by alleging with particularity a "sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists.").  To the contrary, the Complaint acknowledges that (1) Hecla's directors have significant experience with mining and exploration companies (*see* Compl., ¶¶ 27, 33, 38-39, 42-43, 46, 49-50, 54, & 57-58 (Docket No. 33)), and (2) Hecla maintained a Safety Committee to oversee Hecla's compliance with its health, safety, and environmental policies (*see id*. at ¶¶ 211-213).  Such allegations do not forever preclude an interrelated claim premised upon breach of fiduciary/oversight duties, but if not counteracted with specific and particular allegations calling into question the existence of a valid and operational oversight/reporting system, a claim to the contrary is necessarily compromised.  *See South*, 62 A.3d at *8 & *18 ("The Safety Committee's existence and mandate are likewise inconsistent with the complaint's central premise of intentionally indolent directors. . . . .  These pled facts do not support an inference of an 'utter failure to attempt to assure a reasonable information and reporting system exists,' but rather the opposite:  an evident effort to establish a reasonable system.  The complaint thus 'refutes the assertion that the directors' utterly failed to attempt to fulfill their oversight obligations.") (quoting *Caremark*, 698 A.2d at 971; *Stone*, 911 A.2d at 372) (citing *Ash v. McCall*, 2000 WL 1370341, *15, n.57 (Del. Ch. 2000) ("the existence of an audit committee . . . is some evidence that a monitoring and compliance system was in place")).[13]

---

[13]  Plaintiffs' reliance on *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003) also claims more ground than is justified.  *See* Pls.' Opp. to Mot. to Dismiss, pp. 16-17 (Docket No. 43).  In addition to not being controlling upon this Court, in *Abbot Labs*, the FDA conducted 13 inspections of the company to determine whether it was in compliance with FDA regulations, sent four certified warning letters to the company (three of which were sent directly to the chairman of the board), implemented a "Voluntary Compliance

**MEMORANDUM DECISION AND ORDER - 22**

### b.   The Alleged Breaches by Hecla Directors of Fiduciary Duties Regarding False and Misleading Statements to the Public

"[E]ven in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith."  *infoUSA*, 953 A.2d at 990.  "When there is no request for shareholder action, a shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors 'deliberately misinform[ed] shareholders about the business of the corporation, either directly or by a public statement.'" *Citigroup*, 964 A.2d at 132 (quoting *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998)).  This is accomplished by (1) "alleg[ing] with sufficient specificity the actual misstatements or omissions that constituted a violation of the board's duty of disclosure," including "allegations regarding what the directors knew and when"; (2) "specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow [the court] to reasonably conclude that the director defendants face a substantial threat of personal liability"; and (3) "sufficiently alleg[ing] that the director defendants had knowledge that any disclosures or omissions were false or misleading or that the director defendants acted in bad faith in not adequately informing themselves."  *Citigroup*, 964 A.2d at 132-134 (internal citations omitted). Defendants argue that Plaintiffs failed to satisfy these requirements when alleging that Hecla's directors breached their fiduciary duties by "allowing false and misleading statements to be disclosed to the public" (Compl., ¶ 289 (Docket No. 33)).  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, pp. 16-19 (Docket No. 40, Att. 1).  The undersigned agrees.

---

Plan" to remedy compliance problems, filed a court complaint seeking an injunction, ordered the company to destroy non-compliant product inventory, and met at least ten times with company representatives, including the chairman of the board.  *See Abbott Labs*, 325 F.3d at 799-802. *Abbott Labs* offers a more compelling collection of red flags, linked directly to a starker picture of a sustained and systematic failure of board oversight.  In contrast, here, there is no indication (or even allegation) of individual board member involvement with respect to any administrative agency warnings.

**MEMORANDUM DECISION AND ORDER - 23**

First, Plaintiffs' Complaint does not specify how false and misleading statements allegedly made by Hecla directors to the public actually harmed Hecla itself – that is, absent any harm to Hecla, there is necessarily no basis to conclude that its directors face any corresponding liability. *See id.* at p. 17. To the extent the requisite harm is premised upon the related securities fraud lawsuit before Judge Winmill (*see supra*; Compl., ¶¶ 15 & 273 (Docket No. 33)), that action was dismissed on September 26, 2013. *See Bricklayers of Western Pennsylvania Pension Plan v. Hecla Min. Co.*, 2013 WL 5423875 (D. Idaho 2013).[14] Alternatively, where the requisite harm is premised upon damages allegedly caused by Hecla's "devastated" credibility at the hands of any alleged false and misleading statements (*see* Compl., ¶ 271 (Docket No. 33)), Plaintiffs offer no supporting particularized allegations of fact to that end.

Second, Plaintiffs' Complaint contains a scattershot collection of allegations that the "Director Defendants caused Hecla" to issue false and misleading statements. *See, e.g.*, *id.* at ¶¶ 225, 226, 232, 234, 237, 241, 245, 248, 252, 254, & 258. A closer examination of that section of Plaintiffs' Complaint (*see id.* at ¶¶ 224-258) reveals only one instance where Hecla's board *in toto* issued a statement (the February 25, 2011 Form 10-K). *See id.* at ¶ 229.[15] The rest of the

---

[14] Although granting the defendants' motion to dismiss, Judge Winmill gave the plaintiffs until October 18, 2013 to amend their complaint. However, the plaintiffs never amended their complaint and, on November 5, 2013, Judge Winmill entered a judgment in the defendants' favor, dismissing the case in its entirety, with prejudice.

[15] The Form 10-K states in part that "[w]e strive to achieve excellent mine safety and health performance," then lists the various ways such a goal is to be achieved. *See* Compl., ¶ 229 (Docket No. 33). Such a statement constitutes an expression of optimism or an aspirational ideal that does not, by itself, amount to the basis of a claim against Hecla's board once something bad happens. *See, e.g.*, *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, *8 (Del. Ch. 2010) ("Under Delaware law, a company's optimistic statements praising its own 'skills, experience, and resources' are mere puffery and cannot form the basis for a fraud claim.'") (citing *Solow v. Aspect Res., LLC*, 2004 WL 2694916, *3 (Del. Ch. 2004)); *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 83 (D. Del. 2002) ("The Third Circuit has

**MEMORANDUM DECISION AND ORDER - 24**

allegedly false and misleading statements were reports, press releases, earnings updates, or statements made to analysts by management, not the Hecla board as a whole.[16]  What is left, then, are generalized allegations that Hecla's board made (or consciously permitted Hecla to make) false and misleading statements.  This is just not enough.  *See Citigroup*, 964 A.2d at 133, n.88 ("Pleading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1.  It is unclear from such allegations how the board was actually involved in creating or approving the statements, factual details that are crucial to determining whether demand on the board of directors would have been excused as futile.").

   Third, and perhaps most importantly, Plaintiffs' Complaint overlooks the need for factual allegations speaking to the directors' subjective awareness of the allegedly false and misleading statements.  *See id.* at 134 ("A determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants, and plaintiffs have not made specific factual allegations that would allow for such an inquiry.").  The fact of accidents at Hecla's Lucky Friday mine or MSHA's investigations and citations related thereto – significant as they may be – does not mean (for the purposes of considering Defendants' Motion to Dismiss) that Hecla's directors understood that the statements in question were false or materially misleading when made.  *See*

---

recognized that vague, non-specific statements of optimism or hope by corporate managers are inactionable in a securities fraud case.").

  [16]  It should be pointed out that, while Plaintiffs' Complaint largely fails to reference allegedly false and misleading statements made by the entire Hecla board, it does reference statements made by a single board member, Mr. Baker (also Hecla's CEO).  *See, e.g.*, Compl., ¶¶ 227, 238, 242 (Docket No. 33).  Still, Plaintiffs do not allege that any other statement was signed by any Hecla director other than Mr. Baker.

**MEMORANDUM DECISION AND ORDER - 25**

*id.* at 135 ("Merely alleging that there were signs of problems in the subprime mortgage market is not sufficient to show that the director defendants knew that Citigroup's disclosures were false or misleading.  The allegations are not sufficiently specific to Citigroup or to the director defendants to meet the strict pleading requirements of Rule 23.1.").  Again, more is needed.[17]

### c.   *Board Committee Members' Alleged Exposure to a Substantial Threat of Liability*

Along with allegations against Hecla's entire board, Plaintiffs allege that certain directors (those on Hecla's Safety and Audit Committees) "face further risk of liability" given their additional committee responsibilities.  *See* Compl., ¶¶ 292-300 (Docket No. 33).

•   *Hecla's Safety Committee*

Plaintiffs contend that Defendants Bowles, Rogers, Stanley, and Taylor, who were members of Hecla's Safety Committee, (1) had a duty "'to assist the Board of Directors in fulfilling its oversight responsibilities in relation to: reviewing health, safety, and environmental policies'"; (2) received reports on "'any material noncompliance with health, safety or environmental law, and management's response to such noncompliance'"; and (3) after receiving such reports, "utterly failed to comply with this duty."  *Id.* at ¶ 294; *see also id.* at ¶ 295 ("Through the reports [D]efendants Bowles, Rogers, Stanley, and Taylor received, they were aware of the history of ongoing MSHA violations at the Lucky Friday mine and then failed to properly deal with the Company's insufficient response to the repeated and mounting dangerous conditions at the Lucky Friday mine.").  In response, Defendants argue that "[t]hese boilerplate

---

[17]   As Defendants point out in their briefing, Plaintiffs offer no response to Defendants' arguments that Plaintiffs' Complaint fails to adequately allege that Hecla's directors face liability for allowing false and misleading statements to be disclosed.  *See* Defs.' Reply in Supp. of Mot. to Dismiss, p. 5, n.1 (Docket No. 52)

**MEMORANDUM DECISION AND ORDER - 26**

allegations are no more particularized than [P]laintiffs' oversight allegations against the entire board."  Defs.' Mem. in Supp. of Mot. to Dismiss, p. 20 (Docket No. 40, Att. 1).  For reasons similar to those described above, the undersigned agrees.

First, notwithstanding Plaintiffs' claim that Safety Committee members received certain reports yet failed to take any action (*see supra*), the necessary details buttressing such claims are notably lacking.  There are no allegations of what reports the Safety Committee received, when it received the reports, what was contained in them, and/or what the Committee did or did not do in response to that information.  In other words, Plaintiffs do not tie any of these Defendants' actual conduct to their individual liability beyond, simply, their association with a committee whose generalized duties are associated in name with safety incidents at the Lucky Friday mine. The fact that accidents occurred, without more, does not establish that these Defendants face a substantial threat of liability.  When considering this very issue, the court in *South* explained:

> Rather than making particularized allegations about red flags and director knowledge, the plaintiffs argued that the members of the Safety Committee must have known about and consciously ignored the problems at the Lucky [Friday] mine because they were charged with overseeing safety.  As numerous Delaware decisions make clear, *an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of Rule 23.1.  The existence of the Safety Committee and the scope of its charter are not sufficient to establish the necessary connection to the Board.*

*South*, 62 A.3d at *17 (emphasis added).

Second, to the extent Plaintiffs provide more specificity to their allegations concerning Hecla's Safety Committee members' potential liability by referencing the MSHA reports generated after the April 15, 2011 and November 17, 2011 accidents (discussed *supra*; *see also*

**MEMORANDUM DECISION AND ORDER - 27**

Compl., ¶¶ 296 & 297 (Docket No. 33)), such claims remain incomplete.  Not only do these reports not mention any directors on Hecla's Safety Committee (referring instead to the Lucky Friday mine's "management" (*see supra*, citing *South*, 62 A.3d at \*16)), they explicitly go on to describe Hecla's subsequent "corrective actions" (*see, e.g.*, Ex. B to Defs.' Mot. to Dismiss, pp. 7-9 (Docket No. 40, Att. 3); Ex. C to Defs.' Mot. to Dismiss, pp. 5-6 (Docket No. 40, Att. 4)). References to "corrective actions" implicitly contradict Plaintiff's retrospective claim that Hecla and/or its Safety Committee did nothing in response to these accidents.[18]

• *Hecla's Audit Committee*

Plaintiffs contend that Defendants Bowles, Rogers, and Stanley, members of the Audit Committee, each face a substantial threat of liability for Hecla's public disclosures.  *See* Compl., ¶¶ 299 & 300 (Docket No. 300) (outlining Audit Committee's duties and alleging that Defendants Bowles, Rogers, and Stanley breached these duties by "allow[ing] the issuance of public statements that were false and misleading).  Defendants challenge these allegations, arguing that Plaintiffs "offer no well-pled factual allegations to support this conclusory assertion" and that "'shareholder plaintiffs must show that the misstatement was made knowingly or in bad fath,' which is not met by bare allegations that a directors' committee was charged with reviewing a company's public statements."  Defs.' Mem. in Supp. of Mot. to Dismiss, pp. 22-23 (Docket No. 40, Att. 1) (quoting *Citigroup*, 964 A.2d at 135).  For reasons similar to those articulated above, the undersigned agrees.

Merely alleging the fact of a director defendant's membership on a company's audit committee – like those on the company's board itself (*see supra*) – does not support an inference

---

[18]  The reports' discussion of these corrective actions only cuts against Plaintiffs' currently-pled allegations; it does not prevent claims against Hecla's board and/or Safety Committee members in the event more particularized facts can be alleged going forward.

**MEMORANDUM DECISION AND ORDER - 28**

that a director knowingly breached a fiduciary duty (measured by the aspirational standard

established by the internal documents detailing a company's oversight system) in connection

with any alleged misstatements by management.  *See South*, 62 A.3d at *17, n.6 (citing *Wood*,

953 A.2d at 142 (rejecting allegation that service on Audit Committee was sufficient to support

inference of knowing participation in illegal conduct); *Citigroup*, 964 A.2d at 126-28 (rejecting

as insufficient allegations based on directors' membership in Audit & Risk Management

Committee and status as financial experts); *Rattner*, 2003 WL 22284323 at *12-*13 (rejecting

inference that directors who were alleged to have served on Audit Committee therefore faced "a

substantial likelihood of liability for failing to oversee [the company's] compliance with required

accounting and disclosure standards"); *Desimone*, 924 A.2d at 940 (holding that allegations

about extensive backdating of stock options did not support inference "that [the corporation's]

internal controls were deficient, much less that the board, the Audit Committee, or [the

corporation's] auditors had any reason to suspect that they were or that backdating was

occurring")).

Plaintiffs' opposition to Defendants' Motion to Dismiss does not highlight any

allegations within their Complaint where more *particular* facts can be found associating the

Safety and/or Audit Committee members' individual conduct with liability.  Instead, Plaintiffs

reiterate their general contention that, "[w]here committee members have permitted wrongdoing

to occur, they face a substantial threat of personal liability, creating a reasonable doubt as to their

disinterestedness in considering a demand.  *See* Pls.' Opp. to Mot. to Dismiss, pp. 19-20 (Docket

No. 43).  This is insufficient toward fending off a motion to dismiss and Plaintiffs' legal citations

suggesting the opposite are misplaced.  *See supra* (citing *South*, 62 A.3d at *17 (discussing

**MEMORANDUM DECISION AND ORDER - 29**

Delaware precedent rejecting inference that committee members knew of and ignored alleged problems by virtue of their delegated authorities)).

First, in *In re Countrywide Financial Corp. Derivative Litigation*, 554 F. Supp. 2d 1044 (C.D. 2008), the district court in California pointed to specific "red flags of such prominence" that went to "the very core" of the company's business model such that defendants "must have examined and considered them in the course of their committee oversight duties." *Id*. at 1082. This Court acknowledges that there is a certain syllogistic attractiveness to such an analysis upon the facts of this case. After all, the nature of the accidents and the following investigations are of a nature that seem to be inescapably bound for discussion in the boardroom. But, the nature of Delaware law upon such matters (and in particular as to the burden that must be carried by Plaintiffs in this case) requires more than a "how could they not have known" argument. Plaintiffs offer no particularized facts demonstrating that Hecla's board/committee members were aware of the so-called red flags pertaining to wrongdoings within the company – let alone red flags speaking directly to the very core of Hecla's business model. *See supra*. Absent this level of detail in such allegations, there is no place for reliance upon "inferences of scienter" such as employed by the *Countrywide* court to support individual defendant liability, even if recognized under Delaware law. *See* Defs.' Reply in Supp. of Mot. to Dismiss, p. 13 (Docket No. 52) ("No Delaware court has ever approved such an inference, and even the *Countrywide* court cited to decisions of Delaware and other courts holding precisely the opposite.").

Second, *In re Reliance Securities Litigation*, 135 F. Supp. 2d 480 (D. Del. 2001), spoke to whether subcommittee members could be considered "control persons" under section 20(a) of the Exchange Act for the purpose of imposing secondary liability on individuals exercising

**MEMORANDUM DECISION AND ORDER - 30**

control over a primary violator of the securities laws. *See id*. at 518. As pled, this is not a question raised in the instant litigation and not addressed in Defendants' Motion to Dismiss.

Finally, *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007) dealt with allegations of board/committee members' approval/acceptance of the backdating of stock options. *See id*. at 355-56. *Ryan* addressed allegations of actual board/committee member conduct, not whether mere membership on a committee could create a substantial threat of individual liability so as to excuse demand under FRCP 23.1.

Like before, Plaintiffs' failure to plead with more particularity impairs their ability to show that Hecla's Audit Committee members face a substantial likelihood of liability.[19]

---

[19] It is possible that Plaintiffs might find sufficient facts to remedy their failure to plead particular facts establishing board and/or committee member involvement in conscious wrongdoing by obtaining Hecla's books and records under Section 220 of the General Corporation Law, 8 Del. C. § 220. *See China Agritech*, 2013 WL 2181514 at *1 ("Before filing suit, Rish used Section 220 . . . to obtain books and records, and his complaint relies both on materials that the Company produced and on the glaring absence from the production of books and records that the Company should have readily possessed and provided."); *South*, 62 A.3d at *6 ("Because a plaintiff asserting a *Caremark* claim must plead facts sufficient to establish board involvement in conscious wrongdoing, our Supreme Court has admonished stockholders repeatedly to use Section 220 . . . to obtain books and records and investigate their claims before filing suit.") (citing *Beam*, 845 A.2d at 1056 ("Both this Court and the Court of Chancery have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a Section 220 books and records inspection to uncover such facts."); *White v. Panic*, 783 A.2d 543, 556-57 (Del. 2001) ("[T]his case demonstrates the salutary effects of a rule encouraging plaintiffs to conduct a thorough investigation, using the 'tools at hand' including the use of actions under 8 Del. C. § 220 for books and records, before filing a complaint . . . . [F]urther pre-suit investigation in this case may have yielded the particularized facts required to show that demand is excused or it may have revealed that the board acted in the best interests of the corporation."); *Pyott*, 46 A.3d at 344 ("Not surprisingly, without first obtaining books and records, stockholders have not been able to link the trauma to the directors, and their *Caremark* complaints have been dismissed. By contrast, stockholders who have used Section 220 and obtained documents showing board consideration or involvement have been able to survive Rule 23.1 motions. Put simply, fast-filing generates dismissals."); *Markewich ex. rel. Medtronic, Inc. v. Collins*, 622 F. Supp. 2d 802, 810, n.9 (D. Minn. 2009) ("Prior to filing the Complaint in this case, Plaintiff could have inspected Medtronic's books and records to amass a more robust factual predicate to survive a motion to

d.    *Defendants Baker and Taylor's Duty of Loyalty and Alleged Insider Trading*

Plaintiffs contend that Defendants Baker and Taylor "face a further risk of liability for insider sales" because they "sold Hecla stock under highly suspicious circumstances." Compl., ¶¶ 29, 52, 264-265, 267, 301-303 (Docket No. 33). Defendants disagree, arguing that (1) even if true, a majority of Hecla directors remain disinterested, thus providing no basis for excusing a pre-suit demand; and (2) the allegations lack the necessary particularity in any event. *See* Defs.' Mem. in Supp. of Mot. to Dismiss, pp. 23-24 (Docket No. 40, Att. 1). The undersigned agrees.

As a threshold matter, even assuming that Defendants Baker and Taylor breached their duties of loyalty by engaging in illegal insider sales, such allegations do not implicate a majority of Hecla's board. Without more, insufficient facts exist to raise a reasonable doubt that Hecla's directors as a whole are disinterested or face a substantial threat of liability for insider trading. *See, e.g.*, *Rattner*, 2003 WL 22284323 at *11 (holding that plaintiff's allegations did not create reasonable doubt that majority of board is disinterested with respect to insider trading claims because "even somehow assuming Sclavos suffers from a disabling interest, nothing has been pleaded with particularity as to the scienter of seven of the eight members of the Board."). As a result, such a basis for excusing a pre-suit demand is missing.

Further, to support a claim for insider trading "'it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.'" *Id*. (quoting *Stepak v. Ross*, 1985 WL 21137 at *5 (Del. Ch.

---

dismiss, but chose not to do so."); *infoUSA*, 953 A.2d at 973 ("Plaintiffs have followed this Court's oft-issued advice and brought their action based upon documents received as part of a request for books and records under 8 Del. C. § 220. As a result, the amended consolidated complaint overflows with detail.").

**MEMORANDUM DECISION AND ORDER - 32**

1985); citing *Guttman*, 823 A.2d at 505 ("Delaware case law makes the same policy judgments as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter.")).[20]  Looking at Plaintiffs' allegations of insider trading, only conclusory statements are made (*see* Compl., ¶¶ 29, 52, 264-267, 302-303 (Docket No. 33)); no particularized facts exist to indicate that Defendants Baker and Taylor had (and improperly used) material, non-public information.  *See Guttman*, 823 A.2d at 505 (dismissing insider trading claims that "fail[ed] to allege particularized facts that support a rational inference that these five directors possessed information about NVIDIA's actual performance that was materially different than existed in the marketplace at the time they traded, much less that they consciously acted to exploit such superior knowledge.").  Merely pointing out conduct touted as "highly suspicious" – as Plaintiffs attempt to do (*see* Compl., ¶ 301 (Docket No. 33)) – does not satisfy Plaintiffs' burden in opposing Defendants' Motion to Dismiss..[21]

---

[20]  Attempting to distinguish *Rattner* and *Guttman*, Plaintiffs argue that their Complaint does not assert a claim for insider trading but, rather, "merely alleges the suspicious trades support a substantial likelihood of liability for breaching their fiduciary duties of loyalty, rendering any demand upon them futile."  Pls.' Opp. to Mot. to Dismiss, p. 21, n.7 (docket No. 43).  But *Rattner* and *Guttman* dealt with breach of loyalty/fiduciary duties claims in the context of allegedly improper insider stock sales.  *Compare Rattner*, 2003 WL 22284323 at *4-*5 ("Rattner alleges that the Selling Defendants, in violation of their fiduciary duties, engaged in insider trading; that is, the Selling Defendants profited from selling VeriSign common stock . . . while knowing that improper accounting practices at VeriSign, the products of which were publicly disseminated through material misstatements, created an inflated market price."), *with Guttman*, 823 A.2d at 504 ("The cursory allegations of the complaint in this action do not come close to meeting the plaintiffs' burden to show that these five defendants face a substantial threat of liability for insider trading-based fiduciary duty violations. . . . .  This is fatal to the plaintiffs' effort to show demand excusal.").

[21]  In *Guttman*, the court indicated that the plaintiffs' insider trading allegations could also stand to benefit from searching Hecla's books and records via Section 220 of the General Corporation Law, 8 Del. C. § 220.  *See Guttman*, 823 A.2d at 504; *see also Silverberg on Behalf of Dendreon Corp. v. Gold*, 2013 WL 6859282, *13, n.67 (Del. Ch. 2013) (concluding that plaintiff's demand for corporate books and records pursuant to 8 Del. C. § 220 "contributed

**MEMORANDUM DECISION AND ORDER - 33**

3.    <u>Plaintiffs Have Not Properly Alleged That a Majority of Hecla's Directors Lack Independence</u>

Plaintiffs claim that "demand is futile as to Defendant Baker because of his lack of independence."  Compl., p. 75, ¶¶ 304-312 (Docket No. 33).  According to Plaintiffs, Defendant Baker "lacks independence from the other directors due to his interest in maintaining his executive position at Hecla and the ability of the Board to terminate his employment."  *Id*. at ¶ 309.  Except, even if true, these allegations do not speak to the independence of the remaining board members – the *majority* of Hecla's board – to determine whether the absence of any pre-suit demand is excused.  *See supra*.  In short, Defendant Baker's independence (or alleged lack thereof) is immaterial to the issues raised within Defendants' Motion to Dismiss.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, p. 25 (Docket No. 40, Att. 1) ("Even on Plaintiffs' telling, then, this leaves six directors who *are* independent – a clear majority of Hecla's seven-member board.  Thus, Plaintiffs' contention that Baker lacks independence cannot establish that a majority of Hecla's board is incapable of independently making a decision whether Hecla should pursue litigation.") (emphasis in original).[22]

All told, under the unique facts of this case, and recognizing the difficulty in adequately pleading a shareholder derivative suit (*see supra*), Plaintiffs have not demonstrated demand futility.  While their allegations may have survived a motion to dismiss under more typical situations, under Delaware law addressing circumstances presented here, Plaintiffs' allegations

---

significantly" to his ability to plead particularized facts that director defendants possessed material, non-public information when they sold their stock to satisfy requirements of FRCP 23.1).

[22]  Defendants contend that Plaintiffs offer no response to Defendants' argument that Plaintiffs' Complaint fails to adequately allege that a majority of Hecla's directors lack independence.  *See* Defs.' Reply in Supp. of Mot. to Dismiss, p. 5 (Docket No. 52).

**MEMORANDUM DECISION AND ORDER - 34**

(as numerous as they may be) nonetheless fall short of the type of allegations needed to rebut the presumption that a director – when assessing a demand request – would be faithful to his fiduciary duties.  Therefore, Plaintiffs' derivative claims are dismissed for failing to adequately plead demand futility.

**C.      Plaintiffs' Contemporaneous Ownership of Hecla Stock and Standing**

To establish standing under FRCP 23.1, a shareholder's derivative complaint must allege that the "plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law."  Fed. R. Civ. P. 23.1(b)(1).[23]  In essence, this "contemporaneous ownership rule" is a procedural requirement that "denies a derivative plaintiff standing to challenge transactions that occurred prior to the time the plaintiff became a shareholder."  *Ensign Corp. v. Interlogic Trace, Inc.*, 1990 WL 213085, *2 (S.D.N.Y. 1990).  "The policies underlying the requirement are twofold: (1) to prevent potential derivative plaintiffs from 'buying a lawsuit' by purchasing stock; and (2) to insure that derivative actions are brought by shareholders who have actually suffered injury and have an interest in the outcome of the case."  *Id.*

Plaintiffs' Complaint alleges that each Plaintiff owned Hecla stock at times relevant to this action, and is a current Hecla stockholder.  *See* Compl., ¶¶ 20-22 (Docket No. 33).  Are such generalized allegations enough under FRCP 23.1?  Defendants say no; Plaintiffs say yes. *Compare* Defs.' Mem. in Supp. of Mot. to Dismiss, pp. 8-9 (Docket No. 40, Att. 1) ("'This

---

[23]  Section 327 of the General Corporation Law, 8 Del. C. § 327, parallels FRCP 23.1's contemporaneous ownership requirement and provides: "In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law." 8 Del. Code § 327

**MEMORANDUM DECISION AND ORDER - 35**

vague allegation does not satisfy the strict standard of Rule 23.1'") (quoting *Accuray, Inc.*
*S'holder Deriv. Litig.*, 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010)), *with* Pls.' Opp. to Mot. to
Dismiss, pp. 23-25 (Docket No. 43) ("Nothing in [FRCP 23.1] requires the specificity that the
Defendants demand.").

No uniformly-recognized, bright-line, rule dictates the degree of specificity needed when
alleging a shareholder's standing to bring a derivative suit.  Had Defendants' Motion to Dismiss
focused on this issue alone (or its alternate arguments rejected), this Court would dissect the
arguments, contrasting them against the case law in various circuits, and resolve as a matter of
law the parties' positions.  But that is not this case.  Although the Court has concluded that
Plaintiffs' Complaint must be dismissed for failure to adequately plead demand futility, the
decision doing so is made without prejudice and Plaintiffs will be granted leave to amend their
Complaint to address the shortcomings raised by Defendants' Motion to Dismiss and identified
in this Memorandum Decision and Order.  With this in mind (and in the interests of
completeness), should Plaintiffs seek to file an amended complaint, any amendment should also
incorporate more specificity as to the timing and duration of Plaintiffs' ownership of Hecla
stock.  Such information is readily available to Plaintiffs and easily integrated into any pleading
in the event this litigation progresses to that point.

///

///

///

///

///

**MEMORANDUM DECISION AND ORDER - 36**

## III.  ORDER

For the foregoing reasons, IT IS HEREBY ORDERED THAT Defendants' Motion to

Dismiss (Docket No. 40) is GRANTED, with leave to amend.

Within 42 days of this Memorandum Decision and Order, Plaintiffs may move to file an

Amended Complaint.



DATED:  **February 20, 2014**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 37**